[941 NYS2d 59]

HSH NORDBANK AG, Respondent-Appellant, v UBS AG et al., Appellants-Respondents.

First Department, March 27, 2012

### APPEARANCES OF COUNSEL

*Paul, Hastings, Janofsky & Walker LLP*, New York City (*Barry G. Sher, James R. Bliss, James B. Worthington* and *Kevin P. Broughel* of counsel), for appellants-respondents.

*Quinn Emanuel Urquhart & Sullivan, LLP*, New York City (*Philippe Z. Selendy, Peter E. Calamari, Sandford I. Weisburst* and *Isaac Nesser* of counsel), for respondent-appellant.

### OPINION OF THE COURT

FRIEDMAN, J.

The primary question on this appeal is whether plaintiff HSH Nordbank AG (HSH), a German commercial bank, has stated a cause of action for fraud against defendants UBS AG and UBS Securities LLC (collectively, UBS), an investment bank. The dispute arises from what was essentially a credit default swap transaction, in which, to simplify, HSH, in exchange for a stream of premium payments, assumed the risk of the first half billion dollars of losses on a $3 billion portfolio of securities related to the United States real estate market (the reference pool). In sum and substance, HSH alleges that UBS induced it to enter into the transaction by misrepresenting the risk involved and the manner in which UBS intended to manage the composition of the reference pool.

For a number of reasons, we find that the fraud claim must be dismissed as legally insufficient pursuant to CPLR 3211 (a) (1) and (7). First, HSH—a sophisticated commercial entity—cannot satisfy the element of justifiable reliance, inasmuch as the undisputed documentary evidence establishes that HSH agreed that it was not relying on any advice from UBS; assented to the inherent conflicts of interest that would result from UBS's multiple roles with regard to the reference pool; and was explicitly warned of the risks it was undertaking in this highly leveraged and complex transaction. Moreover, the allegations of the amended complaint itself establish that HSH

could have uncovered any misrepresentation of the risk of the transaction through the exercise of reasonable due diligence within the means of a financial institution of its size and sophistication. Finally, the fraud claim is duplicative of HSH's claim for breach of contract (which is not at issue on this appeal) to the extent it is based on allegations that UBS misrepresented how it intended to manage the reference pool. Accordingly, we modify the orders under review to dismiss the fraud claim, and, upon HSH's cross appeal, affirm the dismissal of the cause of action for negligent misrepresentation and the demand for punitive damages.

The relevant facts are alleged in the amended complaint and established by the undisputed documentary evidence. In March 2002, UBS entered into a financial transaction known as a collateralized debt obligation (CDO) with HSH's predecessor-in-interest, Landesbank Schleswig-Holstein, a German bank with reported assets of €140 billion as of December 31, 2001.[1] As a result of this highly complex transaction, HSH was to receive (indirectly) a stream of premium payments from UBS and, in exchange, to assume a portion of the risk of defaults in the reference pool, a $3 billion securities portfolio assembled by UBS, comprised predominantly of assets linked to the United States real estate market (for example, mortgage-backed securities and instruments issued by real estate investment trusts).

The CDO was structured around a special-purpose entity formed by UBS, North Street Referenced Linked Notes, 2002-4 Limited (NS4), which entered into a credit default swap with UBS on the closing date. In a credit default swap, the "protection buyer" pays a periodic fee (resembling an insurance premium) to the "protection seller" to cover the credit risk on an underlying security or group of securities. The protection seller becomes obligated to compensate the protection buyer if a "credit event," usually defined as a payment default, a credit rating downgrade, or other credit-related loss of value, occurs with respect to an underlying security. While a credit default swap is in some respects analogous to an insurance policy (with the protection seller corresponding to the insurer and the protection buyer to the insured), it differs from conventional insurance in that the protection buyer need not own the underly-

---

1. Landesbank Schleswig-Holstein was absorbed into HSH Landesbank AG in a merger with another German bank that was effected in 2003. For ease of reference, we use the term "HSH" to refer to both HSH Nordbank AG and Landesbank Schleswig-Holstein.

ing security or securities or otherwise have any insurable interest therein. Concomitantly, the protection buyer need not suffer an actual loss to be entitled to a payment in the event of a credit event.

Under the credit default swap at issue here, NS4, as protection seller, in exchange for UBS's agreement to pay premiums, agreed to make certain payments to UBS, as protection buyer, upon the occurrence of defined adverse "credit events" affecting securities in the aforementioned reference pool. While the securities in the reference pool were required to meet certain ratings specifications, UBS selected the initial securities for the pool, and also had the right to substitute assets in and out of the pool during the life of the credit default swap, within defined parameters and through the use of internal procedures specified in a reference pool side agreement between UBS and HSH.[2] The governing documents required that by March 2004, 70% of the reference pool would be comprised of asset-backed securities, real estate investment trust assets, and commercial mortgage-backed securities.

At the same time that UBS and NS4 entered into the credit default swap, HSH purchased $500 million of notes (divided into four classes) issued by NS4 (the NS4 notes).[3] Two classes of NS4 notes subordinate to HSH's notes, with aggregate face value of $74 million, were purchased by UBS. This use of multiple classes of debt obligations, or "credit tranches," is a standard feature of CDOs, with senior classes afforded greater security, but lower interest rates, than junior classes. In the NS4 transaction, the interest payments on the notes issued by NS4 were to be funded by the cash flows from UBS's premium

---

**2.** The reference pool side agreement between UBS and HSH provided that UBS would establish a six-member committee of UBS employees that would "monitor the credit quality of the [r]eference [p]ool." UBS further agreed to provide monthly reports about the reference pool to the committee and HSH and to give advance written notice of proposed substitutions in the reference pool. In certain situations, HSH was afforded veto power over substitutions. Whether UBS complied with these requirements in managing the reference pool is at issue in HSH's cause of action for breach of contract, which, as previously noted, is not before us.

**3.** The classes of NS4 notes that HSH purchased were as follows (in descending order of seniority): $353 million of class A notes, with an interest rate of LIBOR plus 0.8%, rated AAA by Fitch; $40 million of class B notes, with an interest rate of LIBOR plus 1.25%, rated AA by Fitch; $46 million of class C notes, with an interest rate of LIBOR plus 1.85%, rated A by Fitch; and $61 million of class D notes, with an interest rate of LIBOR plus 3.35%, rated BBB by Fitch.

payments under the credit default swap. At the same time, the proceeds of the notes were held to secure NS4's potential obligations to UBS under the credit default swap. In the event of NS4's becoming obligated to make payments to UBS under the swap, there would be corresponding reductions in the principal balance of each class of NS4 notes, in reverse order of seniority. HSH's exposure to the risk of credit events in the reference pool was cushioned by the junior notes purchased by UBS, which were to bear losses first. Because of the leveraged nature of the transaction—which provided $574 million of protection against credit events in a $3 billion portfolio—the entire investment in the NS4 notes would be wiped out by a decline of approximately 19% in the value of the reference pool.

The contractual documents governing this heavily negotiated transaction, and the offering circular (i.e., prospectus) for the NS4 notes, are replete with detailed disclosures of the considerable risks involved and of the conflicts of interest arising from UBS's multiple roles (to be more fully discussed below). In addition, the documents contain disclaimers establishing that, not only were UBS and HSH dealing with each other at arm's length, but that HSH was not entering into the deal in reliance on any advice from UBS. In particular, section 2.06 (i) (x) of the indenture pursuant to which the notes were issued provides that each holder of notes, "by its purchase thereof, will be deemed to have represented and agreed" to terms including the following:

> "[The noteholder] acknowledges and agrees that: (A) none of [UBS] or [its] affiliates is acting as a fiduciary or financial or investment advisor for it; (B) it is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of [UBS] or any of [its] affiliates; and (C) it has consulted with its own legal, regulatory, tax, business, investment, financial, accounting and other advisors to the extent it has deemed necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by [UBS]."

Similarly, the offering circular for the notes contained the following warning (among many others) in capitalized letters: "IN MAKING AN INVESTMENT DECISION, INVESTORS MUST

RELY ON THEIR OWN EXAMINATION OF . . . THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED."

In addition, as one would expect in a transaction of this kind, the offering circular warned: "No dealer, salesman or other person has been authorized to give any information or to make any representations other than those contained in this Offering Circular and if given or made such other information or representations must not be relied upon as having been authorized by [NS4] or [UBS]."

It is undisputed that, for the first six years of the NS4 structure's operation, no credit events occurred in the reference pool, and that HSH therefore collected the full amount of interest due on its notes, without diminution, during that period. In 2008, however, with the collapse of the United States real estate market and the onset of the global financial crisis, credit events in the reference pool began to occur in abundance. The amended complaint alleges that credit events in the reference pool have accumulated to such an extent that "HSH has experienced a near-total loss of its $500 million investment." This change of fortune led HSH to commence this action.

In lieu of answering, UBS moved to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7). Ultimately, Supreme Court granted the motion as to the cause of action for negligent misrepresentation and the demand for punitive damages, but denied it as to the causes of action for fraud and breach of contract. UBS has appealed the denial of its motion as to the fraud claim only; HSH cross-appeals from the dismissal of the negligent misrepresentation claim and the demand for punitive damages. We turn first to the fraud cause of action.

All of the misrepresentations alleged in the amended complaint in support of the fraud claim ultimately relate to the level of risk attached to the securities in the reference pool, on which hinged the likelihood of credit events occurring that would reduce or eliminate the return on HSH's notes. As previously noted, the governing documents required UBS to select securities for the reference pool that met specified credit rating standards (for example, the minimum rating for a security in the reference pool was BBB, and the reference pool as a whole was required to have an average rating exceeding BBB+). Notably, the fraud claim is *not* based on an allegation that UBS did not intend to abide by the contractual standards for ratings of

securities to be included in the reference pool.[4] Rather, the claim is that UBS knew that the published ratings of securities of the kinds to be used in the reference pool were not entirely reliable guides to the risk of these assets. The amended complaint alleges that UBS harbored the undisclosed intent to engage in "ratings arbitrage" in managing the reference pool. HSH explains "ratings arbitrage" as

> "[t]he systematic selection and substitution of credits which had the requisite credit rating, but *traded at wide spreads* (i.e., were higher risk) for that rating. This 'ratings lag' reflects *the market's understanding, evidenced by the lower value of the security*, of a deterioration in credit quality in advance of ratings agency downgrades" (emphasis added).

As shown by the phrases emphasized in the above quotation from the amended complaint, by HSH's own account, the potential for a discrepancy between a security's credit rating and its actual risk was understood in the relevant marketplace at the time. In other words, the unreliability of credit ratings was sufficiently well known that securities often traded at a discount to the price their credit rating (if accurate) would have warranted. At bottom, HSH is complaining that UBS—which HSH agreed was not acting as its advisor or fiduciary in this matter—induced it to enter into a deal that would enable UBS to exploit, at HSH's expense, a feature of the relevant securities market that was common knowledge among participants in that market. This does not constitute a legally sufficient cause of action for fraud, certainly not when pleaded by a sophisticated business entity that disclaimed reliance on the party it now accuses of fraud.

It may be that HSH was poorly advised to purchase the NS4 notes, given that the standards for securities in the reference pool were stated in terms of often unreliable credit ratings. Under the disclaimers set forth in the extensively negotiated governing documents, however, HSH had no right to look to UBS for advice concerning the suitability of the deal for HSH.[5]

---

4. Of course, in litigating its breach of contract cause of action, HSH may seek recovery for a breach of the ratings standards for the reference pool, if it is able prove that such a breach occurred.

5. Again, in purchasing the notes, HSH expressly agreed (in the words of the indenture) that it was "not relying . . . upon any advice, counsel or repre-

Hence, HSH cannot predicate a fraud claim upon the allegation that UBS disingenuously recommended that HSH enter into a transaction that, while favorable to UBS, was disadvantageous to HSH (*see MBIA Ins. Corp. v Merrill Lynch*, 81 AD3d 419, 419 [2011] [dismissing fraud claim by a "sophisticated business entit(y)" that had agreed to disclaimers "providing that (it) would not rely on defendants' advice, that it had the capacity to evaluate the transactions, and that it understood and accepted the risks"]; *Chase Manhattan Bank v New Hampshire Ins. Co.*, 304 AD2d 423, 424 [2003], *lv denied* 100 NY2d 509 [2003] [fraud claim was barred by plaintiff's disclaimer "indicat(ing) that it would make its own investigation of the risks involved"]; *Longo v Butler Equities II*, 278 AD2d 97, 97 [2000] [plaintiff could not claim reliance where documentary evidence established that "he had accepted the risk of a speculative investment based on his independent investigation and without reliance on any representations" by defendants]).

As HSH stipulated that it was dealing with UBS at arm's length, the applicable rule, stated by the Court of Appeals, is as follows:

> "If the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations" (*Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V.*, 17 NY3d 269, 278-279 [2011] [internal quotation marks and brackets omitted]; *see also Danann Realty Corp. v Harris*, 5 NY2d 317, 322 [1959] [same]; *Schumaker v Mather*, 133 NY 590, 596 [1892] [same]).

Consistent with the foregoing, this Court has held that, " '[a]s a matter of law, a sophisticated plaintiff cannot establish that it

---

sentations (whether written or oral) of [UBS]"; that it had received whatever advice it deemed necessary from "its own legal, regulatory, tax, business, investment, financial, accounting and other advisors"; and that it had "made its own investment decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by [UBS]." In addition, the offering circular warned HSH that, as an investor in the notes, it "must rely on [its] own examination of . . . the terms of the offering, including the merits and risks involved."

entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it' " (*Ventur Group, LLC v Finnerty*, 68 AD3d 638, 639 [2009], quoting *UST Private Equity Invs. Fund v Salomon Smith Barney*, 288 AD2d 87, 88 [2001]; *see also Global Mins. & Metals Corp. v Holme*, 35 AD3d 93, 100 [2006], *lv denied* 8 NY3d 804 [2007] ["New York law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations . . . by investigating the details of the transactions"]; *Stuart Silver Assoc. v Baco Dev. Corp.*, 245 AD2d 96, 98-99 [1997] [justifiable reliance cannot be shown "(w)here a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means"]; *Lampert v Mahoney, Cohen & Co.*, 218 AD2d 580, 582-583 [1995] [dismissing fraud claim where "plaintiff failed to undertake an independent appraisal of the risk he was assuming," and thereby "assumed the risk of loss that a proper investigation would have been likely to disclose"]).

The principle that sophisticated parties have "a duty to exercise ordinary diligence and conduct an independent appraisal of the risk they [are] assuming" (*Abrahami v UPC Constr. Co.*, 224 AD2d 231, 234 [1996]; *see also Granite Partners, L.P. v Bear, Stearns & Co. Inc.*, 58 F Supp 2d 228, 259 [SD NY 1999]) has particular application where, as here, the true nature of the risk being assumed could have been ascertained from reviewing market data or other publicly available information (*see Havell Capital Enhanced Mun. Income Fund, L.P. v Citibank, N.A.*, 84 AD3d 588, 589 [2011] ["(t)he fraudulent inducement claim was deficient for lack of justifiable reliance, since (the sophisticated) plaintiff . . . had access to the relevant market information"]; *Alpha GmbH & Co. Schiffsbesitz KG v BIP Indus. Co.*, 25 AD3d 344, 345 [2006], *lv dismissed* 7 NY3d 741 [2006] [fraud claim could not be predicated on concealment of "matters of public record that . . . could have (been) discovered by the exercise of ordinary diligence"]; *National Union Fire Ins. Co. of Pittsburgh, Pa. v Red Apple Group*, 273 AD2d 140, 141 [2000] [to same effect as *Alpha GmbH*]; *see also Granite Partners*, 58 F Supp 2d at 260 [under New York law, investment funds' reliance on brokers' alleged misrepresentations concerning the value of the funds' holdings was unjustifiable as a matter of law where the pleadings established that the funds failed to discharge "their obligations to independently value their portfolios" and "to conduct their own due diligence"]).

Here, the core subject of the complained-of representations was the reliability of the credit ratings used to define the permissible composition of the reference pool. The reliability of those ratings was the premise on which the entire deal was sold to HSH.[6] Far from being peculiarly within UBS's knowledge, the reliability of the credit ratings could be tested against the public market's valuation of rated securities. According to the allegations of the amended complaint itself, a study of the market for the relevant kinds of securities would have revealed that the credit rating conferred on a security by a rating agency did not necessarily correspond to the security's risk level as perceived by the market. In particular, the amended complaint alleges that UBS's internal analyses of its own risk, profit and loss from the transaction was based on models using "market-implied default probabilities"—in other words, probabilities of default that were derived from publicly available market information. Nowhere in the amended complaint does HSH identify any kind of factual data UBS used in its internal analyses of the NS4 deal that was not readily accessible to finance professionals worldwide. Indeed, the amended complaint does not even allege that the models used in UBS's internal analyses—the economic assumptions and mathematical methods employed—were so unique to UBS that an independent appraisal of the risks of the transaction would not have revealed them.

■ HSH alleges that, as a German regional bank, it had "little relevant experience in synthetic CDOs based upon U.S. real estate assets." Assuming this allegation is true, a relative lack of expertise in transactions of this kind would not have given HSH any right to expect UBS to act as its advisor in the deal or to bring to HSH's attention relevant information that HSH could have obtained through its own efforts (see *Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v Salomon Bros. Intl.*, 268 AD2d 373, 374 [2000], *lv denied* 95 NY2d 762 [2000] [no duty to disclose arose "by reason of a claimed disparity in (the) parties' knowledge respecting the risks of the subject transaction," where plaintiff was "a sophisticated institutional investor"]). Again, it cannot be overemphasized that HSH agreed that it was purchasing the NS4 notes

6. For example, the amended complaint alleges that UBS "encourag[ed] HSH to evaluate the risk of loss [from the NS4 notes] on the basis of the ratings agency's historical default probabilities." The rating of the NS4 notes was based on the ratings of the securities in the reference pool, whose performance would determine HSH's profit or loss from the NS4 notes.

based on its own judgment, informed by the views of any third-party advisors it saw fit to consult, and *not* in reliance upon any views expressed by UBS. As contemplated by this contractual provision, if HSH believed that it lacked sufficient expertise to evaluate the NS4 transaction unassisted, it was free to retain qualified outside consultants to render independent advice concerning the risks of the deal and, in particular, whether HSH would be afforded sufficient protection from credit events by the ratings standards applicable to the reference pool. Beyond question, as a financial institution with assets of €140 billion, HSH had the means to obtain such advice concerning a contemplated $500 million investment. Given its representation that it was not relying on any recommendation by UBS in purchasing the NS4 notes, HSH's failure to undertake (either directly or through an advisor) an independent appraisal of the risks of the transaction necessarily leads to the conclusion that HSH was "so lax in protecting [itself] that [it] cannot fairly ask for the law's protection" (*Centro Empresarial*, 17 NY3d at 279 [internal quotation marks omitted]).[7]

Moreover, nowhere does the amended complaint allege that HSH, in the course of the "several months of due diligence" it allegedly conducted, ever asked UBS—which, after all, was acting as a *salesman*, not as HSH's advisor—to produce any alternative analysis of the transaction in its possession. A response to such a request falsely denying that UBS possessed any analysis materially different from those already disclosed arguably would have been fraudulent (*cf. Littman v Magee*, 54 AD3d 14, 18-19 [2008]; *but see Centro Empresarial*, 17 NY3d at 278 [noting that *Littman* "misapprehend(ed) our case law" in certain respects]). But no such false denial is alleged; HSH simply assumes that, in the absence of a request, UBS was obligated to disclose its internal analyses of the deal.[8] In the context of arm's length dealing between sophisticated parties, however,

---

7. The conflict between the theory of HSH's fraud claim and its agreement that it was not buying the notes in reliance on UBS's advice is highlighted by HSH's allegations that UBS is being sued precisely for failing to give HSH good and accurate advice about the deal. For example, the amended complaint alleges that UBS failed to provide "the expertise and *advice* HSH expected" (emphasis added); that UBS "induced HSH to *rely* upon its greater knowledge and expertise in the[ ] [relevant] areas" (emphasis added); and that "HSH *relied* on UBS for truthful and accurate *advice, guidance* and representations" (emphasis added).

8. Of course, whether HSH requested the production of any alternative analysis in UBS's possession is a matter within HSH's direct knowledge, so

UBS had no obligation to disclose internal analyses for which HSH made no request (*see Ventur Group*, 68 AD3d at 639 [dismissing fraud claim where, after plaintiff acquired a company "without asking to see any employment contracts or speaking to . . . a 'key employee,' " the employee resigned, taking clients with him; "(h)aving failed to make any effort to verify (defendant's) representations concerning her client relationships and (the employee's) role in the business, plaintiff cannot demonstrate justifiable reliance on the misrepresentations"]; *Graham Packaging Co., L.P. v Owens-Illinois, Inc.*, 67 AD3d 465 [2009] [affirming the dismissal of a fraud counterclaim based on the alleged concealment of plaintiff's "own valuation of its anticipated claims against defendants" because "defendants, sophisticated entities represented by counsel, should have at least inquired about such valuation" in negotiating the settlement agreement they sought to avoid]; *Permasteelisa, S.p.A. v Lincolnshire Mgt., Inc.*, 16 AD3d 352 [2005] [affirming dismissal of fraud claim where "plaintiff neglected to seek examination of the books and records of the company it was acquiring, relying on an unaudited financial statement that allegedly proved inaccurate"]; *Stuart Lipsky, P.C. v Price*, 215 AD2d 102, 103 [1995] [affirming dismissal of fraud claim where plaintiff purchased law practice "rely(ing) solely upon the alleged oral representations without any effort to verify that information *via* financial statements"]; *Rodas v Manitaras*, 159 AD2d 341, 342 [1990] ["In entering into the contract, with the assistance of counsel and without conducting an examination of the books and records, plaintiffs clearly assumed the risk that the documentation might not support the $20,000 weekly income that was represented to them"]).[9]

---

there is no reason to excuse the failure to allege that such a request was made.

**9.** Readily distinguishable is *DDJ Mgt., LLC v Rhone Group L.L.C.* (15 NY3d 147 [2010]), and not only on the ground that the matters misrepresented therein (concerning a borrower's financial condition) were matters of existing fact peculiarly within the knowledge of the defendants (the borrower's management and controlling entities). It was crucial to the decision sustaining the fraud claim in *DDJ* that the plaintiff lenders "made a significant effort to protect themselves against the possibility of false financial statements . . . [by] obtain[ing] [written] representations and warranties to the effect that nothing in the financials was materially misleading" (*id.* at 156). Needless to say, in this case, UBS never issued any warranty concerning any of the matters HSH claims were misrepresented but, at the time, failed to investigate for itself. On the contrary, it was HSH that warranted in writing that it was not relying on UBS for advice.

Given that the amended complaint itself makes plain that an examination of the relevant securities market would have revealed the fallibility of the credit ratings, HSH's fraud claim would be legally insufficient even in the absence of the disclaimers and disclosures set forth in the transactional documents. The presence of those disclaimers and disclosures only reinforces the conclusion that the fraud claim should be dismissed. A comparison of the disclaimers and disclosures with the various particular misrepresentations alleged by HSH—all of which, to reiterate, relate directly or indirectly to the reliability of credit ratings in the relevant market—show that the disclaimers and disclosures in these documents relate to "the very matter as to which [HSH] now claims it was defrauded" and therefore "destroy[ ] the allegations . . . that the agreement was executed in reliance upon . . . contrary oral representations" (*Danann*, 5 NY2d at 320-321).

█ HSH alleges that UBS represented that the NS4 notes would be a relatively low-risk investment.[10] As a matter of law, however, HSH could not justifiably rely on UBS's alleged characterizations of the risk level of the notes, none of which are found in the offering circular or in the operative contractual documents. As previously noted, HSH expressly disclaimed any reliance upon representations by UBS, whether written or oral, to assess the risk of the transaction, and represented that, in purchasing the notes, it was relying only on its own judgment and on the views of any advisors of its own choosing whom it had seen fit to consult. In addition, the offering circular for the notes cautioned HSH that it "must rely on [its] own examination of . . . the terms of the offering, including the merits and risks involved," and that "any information or . . . representations other than those contained in this Offering Circular . . . must not be relied upon as having been authorized by [NS4] or [UBS]."

Moreover, the offering circular contained extensive disclosures about the highly-leveraged—and hence inherently risky—nature of the investment. For example, the circular contained the following warnings, among others:

---

**10.** For example, the amended complaint alleges that "UBS specifically represented to HSH that HSH's interest would be in very high credit quality paper issued by [NS4]"; that "UBS marketed the [NS4] Notes as being worth par (full face amount) and as warranting their investment grade ratings"; and that it was HSH's "expectation that, as UBS represented, [the NS4 notes] were low-risk investments consistent with [HSH's] conservative investment objectives."

- "[T]he obligation of [NS4] to make payments to [UBS] under the Credit Swap [in the event of credit events in the reference pool] creates *significantly leveraged exposure* to the credit of a number of Reference Entities [i.e., issuers of securities in the reference pool]" (emphasis added).

- "If [NS4] is obligated to make any Credit Protection Payment to [UBS], . . . the Principal Balance of each Class of Notes will be reduced by the amount of such Credit Protection Payment . . . Accordingly, Noteholders *may lose amounts invested in the Notes . . .* or fail to realize expected returns. [UBS] shall owe no fiduciary duties to [NS4], the Noteholders or any other party" (emphasis added).

- "Under the Credit Swap, [NS4] may be obliged to make Credit Protection Payments to [UBS] as a result of Credit Events occurring in respect of the Reference Entities in the Reference Pool. While [NS4's] (and therefore the Noteholders') credit exposure is equal to the Maximum Amount [$574 million], the aggregate Notional Amount of the Reference Pool will initially be U.S.$3 billion. *This leverage increases the risk of loss to [NS4] and, therefore, to the Noteholders*" (emphasis added).

- "[H]olders of the Notes will be *exposed to the credit of the Reference Entities to the full extent of their investment in the Notes* and must rely solely on the proceeds of the Collateral pledged to secure, *inter alia*, each Class of Notes for the payment of the Principal Balance thereof and interest thereon" (emphasis added).

- "There is currently no market for the Notes. There can be no assurance that a secondary market for any of the Notes will develop, or, if a secondary market does develop, that it will provide the holders of the Notes with liquidity or that it will continue for the life of the Notes . . . Consequently, *any purchaser of the Notes must be prepared to hold such Notes for an indefinite period of time*" (emphasis added).

As previously discussed, the risk profile of the NS4 notes depended entirely upon the risk profile of the reference pool, the composition of which was determined by reference to credit

ratings. HSH—by its own account—could have discovered the infirmity of those ratings in the relevant security classes had it examined the market pricing of rated securities. Hence, to reiterate, the facts allegedly misrepresented were not peculiarly within UBS's knowledge (*cf. Steinhardt Group v Citicorp*, 272 AD2d 255, 257 [2000]). And the high degree of leverage in the position HSH assumed as holder of the NS4 notes, while obvious on the face of the terms of the transaction, was expressly disclosed in the offering circular, which also warned HSH that it *"must* rely on [its] *own examination* of . . . the merits and *risks"* of the transaction (emphasis added). HSH should be held to its representation in the heavily negotiated transactional documents that it was not purchasing its notes based on any "advice" from UBS, and should be charged with knowledge of the offering circular's risk disclosures and warning to examine for itself the extent of those risks.

To permit HSH to sue UBS for fraud based on extracontractual representations concerning the risk level of the notes would "in effect condone [HSH's] own fraud in 'deliberately misrepresenting [its] true intention' " when it disclaimed reliance on any such representations at the time of contracting (*Citibank v Plapinger*, 66 NY2d 90, 95 [1985], quoting *Danann*, 5 NY2d at 323). Further, the substance of the relevant disclaimers and disclosures, far from being merely a "generalized boilerplate exclusion" of reliance on statements outside the transactional documents (*id.*), covers the subject matter of the alleged misrepresentation with sufficient specificity to bar the fraud claim.

> "Since the plaintiff stipulated in the contract that it was not relying upon any representations 'as to the very matter as to which it now claims it was defrauded,' such specific disclaimer destroys the allegations in the plaintiff's complaint that the agreement was executed in reliance upon the defendant's . . . representations" (*Mahn Real Estate Corp. v Shapolsky*, 178 AD2d 383, 385-386 [1991], quoting *Danann*, 5 NY2d at 320).[11]

---

11. *See also MBIA*, 81 AD3d at 419 (fraud claim was barred by "specific disclaimers in the contracts . . . providing that plaintiff . . . would not rely on defendants' advice, that it had the capacity to evaluate the transactions, and that it understood and accepted the risks"); *Chase Manhattan Bank*, 304 AD2d at 424 ("fraud claims cannot be brought by a contracting party who specifically disclaimed reliance on extracontractual representations and indicated that it would make its own investigation of the risks involved"); *So-*

HSH also alleges, in vague and conclusory terms, that it was misled as to the "[p]ricing, valuation and subordination" of the NS4 notes. In other words, HSH claims that, given the actual likelihood of credit events in the reference pool, it paid too much for its notes and, in the long run, was unlikely to be protected from loss of principal by UBS's $74 million layer of subordinated notes (which bore losses first). This is just another way of saying that the credit ratings used as parameters for the composition of the reference pool were not reliable indicators of credit quality and understated the likelihood of credit events. Again, HSH disclaimed any right to rely on UBS for advice on these matters, as to which HSH could have conducted or obtained independent research, and the alleged misrepresentations are contradicted by the offering circular's risk disclosures and its warning that HSH "must rely on [its] own examination of . . . the merits and *risks* involved" (emphasis added). Moreover, in arm's length dealings between sophisticated parties, the seller is not obligated to disclose to the buyer its internal valuation of the item sold (*see Granite Partners*, 58 F Supp 2d at 261 [no claim for fraud was stated under New York law by allegations that brokers sold securities to investment funds "at prices well in excess of either the prices at which the (b)rokers had obtained those instruments or the values that the (b)rokers had themselves assigned to the securities"]).

Similarly, HSH complains that UBS marketed the NS4 notes to it "on the basis of ratings agency models" that UBS internally rejected. Specifically, while UBS allegedly

> "encourage[d] HSH to evaluate the risk of loss on the basis of the ratings agency's historical default probabilities, UBS did not use that data to assess its own risk, calculate its profit and loss, or mark its books. Instead, UBS relied upon different internal models that used, among other data, *market-implied default probabilities*" (emphasis added).

As previously discussed, the reference to "market-implied default probabilities" highlights HSH's failure to allege the misrepresentation of any existing fact that HSH could not have

---

*ciete Nationale*, 268 AD2d at 375 ("plaintiff's claim of justifiable reliance is . . . conclusively refuted by the disclaimer of representations of value"); *O&M Gourmet Foods v Marino's 184 Foods*, 225 AD2d 340, 341 (1996) (dismissing fraud claim where plaintiffs "had expressly disclaimed reliance upon the types of misrepresentations alleged in the complaint under the parties' contract of sale").

discovered through its own due diligence. Nonetheless, HSH predicates its fraud claim upon UBS's use of an analysis to sell the deal that was different from the analysis it used internally— without alleging that UBS, in the course of its marketing, uttered any falsehood or concealed any inaccessible information or analytic tools. If we were to allow a fraud claim to go forward on this basis, it would render meaningless HSH's agreement that it was not relying on UBS for "any advice, counsel or representations (whether written or oral)" and had "consulted with its own . . . *business, investment, financial, accounting* and other advisors to the extent it . . . deemed necessary" (emphasis added). Sustaining this claim would likewise nullify the offering circular's caution that HSH "*must* rely on [its] *own examination* of . . . the merits and *risks* involved" (emphasis added). In effect, the message to the corporate and financial world would be that "it is impossible for two businessmen dealing at arm's length to agree that the buyer is not buying in reliance on any representations of the seller as to a particular fact" (*Danann*, 5 NY2d at 323). This is a message we decline to send.

Other misrepresentations by UBS alleged in the amended complaint concerned the performance of UBS's four earlier transactions similar in structure to the NS4 transaction. Here again, HSH does not allege that UBS misrepresented any existing fact or that it concealed any fact unavailable to HSH through the exercise of due diligence. Rather, HSH alleges that, as with the NS4 deal, UBS presented HSH with one analysis of the earlier transactions (one apparently based on the assumption of the reliability of credit ratings) while, internally, UBS used a different analysis of the deals under which the results were less favorable to the outside counterparties and more favorable to UBS. Notably, HSH does not allege that, as part of its due diligence, it made any request to examine UBS's records concerning the earlier transactions. Accordingly, for the reasons already discussed, the amended complaint's allegations of UBS's claims regarding the earlier transactions do not render the fraud claim viable.[12]

---

**12.** Nor is the fraud cause of action saved by the allegation that HSH was somehow misled by the pro forma statement in the credit swap confirmation agreement between UBS and NS4 (to which HSH was not a party) that the directors of NS4 had

> "determined . . . that the Transaction . . . is fully consistent with *its* [i.e., NS4's] financial needs, objectives and condition, . . . complies and is fully consistent with all investment policies, guidelines and restrictions *applicable to it* and . . . is a fit, proper

A substantial portion of the amended complaint is devoted to allegations that UBS misrepresented the manner in which it intended to carry out its role as manager of the reference pool, which involved selecting securities for the pool and substituting securities in and out of the pool. Although no such representations are set forth in the transactional documents, UBS allegedly told HSH that there would be an "alignment of interests" between the two parties, in that UBS's motivation was to establish a mechanism that would "allow it to hold stable assets for the long-term" while reducing its credit exposure to those assets for purposes of complying with internal guidelines. In fact, according to the amended complaint, UBS intended from the outset to use a number of trading strategies in managing the reference pool, and in otherwise dealing with securities in the pool, that would create a conflict of interest between itself and HSH.[13] For two reasons, none of these allegations can support a cause of action for fraud as a matter of law.

■ First, the transactional documents expressly disclosed the potential for conflicts of interests between UBS and HSH to arise in the course of UBS's management of the reference pool and its other trading activities, and provided that HSH would have no claim against UBS arising from such conduct. For example, section 1.15 of the indenture provides:

> "*Conflicts of Interest.* [UBS] and certain of its Affiliates are acting in a number of capacities in connection with the transactions contemplated herein and

and suitable investment *for it*, notwithstanding the clear and substantial risks inherent in entering into the Transaction" (emphasis added).

On its face, this statement concerned the suitability of the transaction *for NS4 itself*, not for HSH. Moreover, NS4, a newly formed Cayman Islands entity, was nothing more than a pass-through special purpose vehicle for the transaction; it had no independent shareholders or real interests of its own, and its directors were all UBS employees (as disclosed in the offering circular). Hence, HSH—which agreed that it was responsible for making its own assessment of the deal's suitability for itself—could not reasonably have relied on the boilerplate statement of the NS4 directors in entering into the transaction.

13. Specifically, it is alleged that "UBS intended to trade against its position in the reference [pool]"; that the assets in the pool, rather than having been "purchased for UBS'[s] long-term portfolio," were specifically "acquired to hedge the [NS4] transaction"; that UBS used its substitution power to "worsen[ ] the overall credit profile of the reference pool"; that UBS took "short positions" against securities in the reference pool, i.e., made bets in the market against the performance of those assets; and that UBS "churned the reference pool portfolio."

in the other Transaction Documents. [UBS] and each of its Affiliates providing services in connection with such transactions shall have only the duties and responsibilities expressly agreed to by such entity in the relevant capacity and shall not, by virtue of it or its Affiliate acting in any other capacity be deemed to have other duties or responsibilities or be deemed to be held to a standard of care other than as expressly provided with respect to each such capacity. [UBS] and its Affiliates in their various capacities in connection with the contemplated transactions may enter into business dealings, including the acquisition of investment securities as contemplated hereby and by the other Transaction Documents, from which they may derive revenues and profits in addition to the fees stated herein and in the various other Transaction Documents, without any duty to account therefor."

Likewise, the offering circular set forth the following warning to HSH:

"Reference Entities may include entities to which [UBS] has, or does not have, credit exposure . . . [UBS] and its affiliates *may deal in any Reference Obligation* [i.e., security in the reference pool] . . . , and generally engage in any kind of commercial or investment banking or other business transactions with, any Reference Entity and *may act with respect to such transactions in the same manner as if . . . the Notes did not exist and without regard to whether any such action might have an adverse effect on the Reference Entity, [NS4] or the holders of the Notes*" (emphasis added).

On the next page, the offering circular makes explicit that UBS has the right to deal as it sees fit with reference entities, "regardless of whether any such action might have an adverse effect *(including, without limitation, any action which might constitute or give rise to a Credit Event)* on any Reference Entity, or the position of any other party to the Transaction Documents or otherwise" (emphasis added).

In view of the specific and detailed disclosures and disclaimers set forth above, it was unjustifiable and unreasonable as a matter of law for HSH to place any reliance on UBS's alleged extracontractual representations concerning a contemplated "alignment of interests" between the two parties, or concerning

UBS's intended "trading strategy" and "motive and economic interest in the deal." Any limitations on UBS's discretion in managing the reference pool or in its other trading activities that HSH expected to be observed should have been incorporated into the heavily negotiated transactional documents, such as the indenture and the reference pool side agreement between UBS and HSH. Again, HSH's claim that UBS breached certain of its contractual obligations under those documents is not at issue on this appeal, and is being litigated in Supreme Court. But to allow HSH to pursue a fraud claim on a theory that essentially writes into the agreements new protections against conflicts of interest is to nullify the foregoing disclaimers and disclosures. "If the language here used is not sufficient to estop [HSH] from claiming that [it] entered the contract because of [the alleged] fraudulent representations, then no language can accomplish that purpose" (*Danann*, 5 NY2d at 323).

Further, HSH's allegations about "alignment of interests," "trading strategy" and "motive and economic interest" concern, for the most part, UBS's alleged misrepresentation either of its intention to breach its contractual obligations as manager of the reference pool or of the manner in which it intended to perform those obligations.[14] As a matter of law, neither of these categories of alleged insincere promises can support a cause of action for fraud. A claim for fraudulent inducement of contract can be predicated upon an insincere promise of future performance only where the alleged false promise is *collateral* to the contract the parties executed; if the promise concerned the performance of the contract itself, the fraud claim is subject to dismissal as duplicative of the claim for breach of contract (*see Havell Capital*, 84 AD3d at 589 [affirming dismissal of fraud claim that "did not allege a breach of any duty collateral to or independent of the parties' agreements" on the ground that it "was redundant of the contract claim"]; *Mañas v VMS Assoc., LLC*, 53 AD3d 451, 453-454 [2008]; *cf. Deerfield Communications Corp. v Chesebrough-Ponds, Inc.*, 68 NY2d 954, 956 [1986] [sustaining fraud claim based on a "collateral" oral promise that was the inducement for the contract]).

This Court recently applied the foregoing principle in the context of a securities-related dispute not unlike this one. In

14. For example, the amended complaint alleges that, contrary to UBS's representation that it "would use the 'substitution' option to protect the credit quality of the portfolio," UBS actually intended to "deliberately substitut[e] riskier, higher spread credits that worsened the overall credit profile of the reference pool."

*Financial Structures Ltd. v UBS AG* (77 AD3d 417 [2010]), while affirming the denial of a motion to dismiss as to the cause of action for breach of contract, we modified to dismiss the fraud cause of action, explaining:

> "The motion court erred . . . in failing to dismiss the fraud cause of action as duplicative of the breach-of-contract cause of action, inasmuch as it is based on the same facts that underlie the contract cause of action, is not collateral to the contract, and does not seek damages that would not be recoverable under a contract measure of damages. The essence of the fraudulent inducement cause of action is that *defendants allegedly misrepresented to plaintiffs their intentions with respect to the manner in which they would manage the underlying assets,* and thus plaintiffs allege a misrepresentation of future intent rather than a misrepresentation of present fact, which is not sustainable as a cause of action separate from breach of contract" (*id.* at 419 [emphasis added and citations omitted]).

By no means do we suggest that UBS, if it engaged in the sharp dealing alleged by HSH, is to be commended; such practices are indeed troubling. Still, however much UBS's alleged conduct leaves to be desired as a matter of business ethics, the undisputed documentary evidence and HSH's own allegations eliminate, as a matter of law, any reasonable inference that HSH justifiably relied on the representations of which it now complains. To sustain HSH's fraud cause of action, we would have to ignore the fact that the amended complaint—assuming the truth of its allegations—does not allege that UBS misrepresented any material existing fact as to which HSH could not have learned the truth had it conducted (or hired a consultant to conduct on its behalf) an independent appraisal of the risks of the NS4 transaction. We would also have to close our eyes to HSH's sophistication; to HSH's disclaimer of reliance on UBS for advice or on any extracontractual representations; to the detailed and specific disclosures of risk and conflict of interest in the transactional documents; to HSH's ability to protect itself through the exercise of due diligence; and to the availability to HSH of appropriate relief (if any) under the rubric of its claim for breach of contract. Indeed, if we were to affirm the denial of the motion to dismiss this fraud claim, we would be judging the sufficiency of a claim asserted by a €140 billion commercial

bank by a standard more lenient than the one by which this Court has judged similar claims made by individual investors against their retail brokers (*see e.g. Matter of Dean Witter Managed Futures Ltd. Partnership Litig.*, 282 AD2d 271 [2001]). Such a result would put in question whether any set of disclaimers and disclosures, no matter how detailed and specific, affords protection against a fraud claim—even a claim by a commercial entity of a high degree of sophistication, and with the resources to hire any outside help it needs—concerning matters subject to discovery through due diligence, and as to which the claimant agreed that it was not relying on the party sitting across the table.[15]

■ Finally, we turn to HSH's cross appeal. As should be evident from the foregoing discussion, the cause of action for negligent misrepresentation was correctly dismissed. The parties expressly agreed that they were dealing with each other at arm's length, that UBS was not acting as HSH's "financial or investment advisor," and that HSH was "not relying (for purposes of making any investment decisions or otherwise) upon any advice, counsel or representations . . . of [UBS]." As a matter of law, therefore, HSH cannot allege that it had a "special relationship" with UBS upon which a negligent misrepresentation claim may be predicated (*see ESE Funding SPC Ltd. v*

---

**15.** HSH brings to our attention two decisions of this Court that have been issued since the argument of this appeal. We find those decisions to be inapposite. In *China Dev. Indus. Bank v Morgan Stanley & Co. Inc.* (86 AD3d 435 [2011]), the denial of the motion to dismiss fraud causes of action was affirmed because we found, based on the allegations of that complaint, that the plaintiff had "sufficiently alleged that [the defendant] possessed peculiar knowledge of the facts underlying the fraud, and the circumstances present would preclude any investigation by [the plaintiff] conducted with due diligence" (*id.* at 436). Such is not the case here. In *MBIA Ins. Corp. v Countrywide Home Loans, Inc.* (87 AD3d 287 [2011]), we sustained the sufficiency of a fraud claim based on alleged misrepresentations "concerning the origination and quality of the mortgage loans underlying" mortgage-backed securities, in that the defendants allegedly "falsely represented that the loans [underlying the mortgage-backed securities] were made in strict compliance with [their] underwriting standards and guidelines, as well as industry standards" (*id.* at 291-292). The decision does not discuss any argument by the defendants in that case that the fraud claim was barred by contractual disclosures or disclaimers (as is the case here) or that the plaintiff could have protected itself through the exercise of due diligence (as is also the case here). Moreover, although not stated in the decision, it appears that the matter allegedly misrepresented—whether the mortgage loans backing the securities that the plaintiff insured were made in compliance with applicable standards—was a matter peculiarly within the knowledge of the defendants, the entities that originated, serviced, and securitized the underlying loans and sold the resulting securities.

*Morgan Stanley*, 68 AD3d 676, 677 [2009]). The demand for punitive damages was also properly dismissed as HSH does not allege that UBS engaged in egregious conduct that was "part of a pattern of similar conduct directed at the public generally" (*Rocanova v Equitable Life Assur. Socy. of U.S.*, 83 NY2d 603, 613 [1994]).

Accordingly, the orders of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered October 1, 2009, and October 15, 2009, which, to the extent appealed from, denied defendants' motion to dismiss the cause of action for fraud and granted defendants' motion to dismiss the cause of action for negligent misrepresentation and the demand for punitive damages, should be modified, on the law, to grant the motion to dismiss the fraud cause of action, and otherwise affirmed, with costs to defendants.

GONZALEZ, P.J., MOSKOWITZ, FREEDMAN and ROMÁN, JJ., concur.

Orders, Supreme Court, New York County, entered October 1, 2009 and October 15, 2009, modified, on the law, to grant the motion to dismiss the fraud cause of action, and otherwise affirmed, with costs to defendants.