Loreley Fin. (Jersey) No. 28, Ltd. v Merrill Lynch, Pierce, Fenner & Smith Inc. (2021 NY Slip Op 04413)





Loreley Fin. (Jersey) No. 28, Ltd. v Merrill Lynch, Pierce, Fenner & Smith Inc.


2021 NY Slip Op 04413


Decided on July 15, 2021


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: July 15, 2021

Before: Renwick, J.P., Gische, Moulton, Mendez, JJ. 


Index No. 652732/11 Appeal No. 13595 Case No. 2020-03832 

[*1]Loreley Financing (Jersey) No. 28, Limited, Plaintiff-Appellant,
v
Merrill Lynch, Pierce, Fenner & Smith Incorporated, et al., Defendants-Respondents, Auriga CDO, Ltd, Defendant.


Meister Seelig & Fein LLP, New York (James M. Ringer of counsel), for appellant.
Cleary Gottlieb Steen & Hamilton LLP, New York (Roger A. Cooper of counsel), for respondents.



Order, Supreme Court, New York County (Andrea Masley, J.), entered on or about May 8, 2020, which, insofar as appealed from, granted the motions of defendants Merrill Lynch, Pierce, Fenner & Smith Inc., Merrill Lynch International Inc., Merrill Lynch & Co., Inc., and 250 Capital LLC for summary judgment dismissing the first amended complaint, reversed, on the law, without costs, the motions denied, and plaintiff's fraud claim reinstated to the extent it relies on an omission as opposed to a representation.
Dismissal of the fraud claims, on the grounds that plaintiff did not raise issues of fact on the fraud elements of loss causation and justifiable reliance on misrepresentations, was not warranted. As to loss causation, Supreme Court found that plaintiff could not establish that its loss was caused by anything other than the intervening events of the 2008-2009 financial crisis.
Plaintiff argues, among other things, that there were no intervening events between defendants' fraud and the loss because it suffered the out-of-pocket loss on the very day in December 2006 when it bought the Auriga securities at an inflated price. Plaintiff, however, is judicially estopped from arguing that it suffered a loss at the inception of the transaction because, in successfully defeating a prior motion to dismiss the fraud claim on the pleadings, plaintiff argued that it suffered a loss in 2008 at the earliest (see Loreley Fin. [Jersey] No. 28, Ltd. v Merrill Lynch, Pierce, Fenner & Smith Inc., 117 AD3d 463 [1st Dept 2014]).
Even if plaintiff was not judicially estopped, plaintiff's argument, that it suffered a loss at the inception of the transaction, is untenable as a matter of law because plaintiff has to prove not only that defendants' misrepresentation caused plaintiff to buy the Auriga securities at an inflated price, but also that the fraud caused the eventual price decline. Other cases involving collateralized debt obligations (CDOs) (see e.g. Basis PAC-Rim Opportunity Fund [Master] v TCW Asset Mgt. Co., 149 AD3d 146 [1st Dept 2017], lv denied 30 NY3d 903 [2017])  indeed, a case involving another "constellation," Magnetar-influenced CDO like Auriga (see Loreley Fin. [Jersey] No. 3 Ltd. v Wells Fargo Sec., LLC, 797 F3d 160, 186-189 [2d Cir 2015])  have required the plaintiff to prove loss causation, i.e., that the fraud caused the eventual price decline.
Nevertheless, plaintiff has raised triable issues of fact about loss causation, namely whether defendants' alleged fraudulent conduct, rather than the the 2008-2009 financial crisis, was the proximate cause of plaintiff's loss (see China Dev. Indus. Bank v Morgan Stanley & Co., 183 AD3d 504, 506 [1st Dept 2020]).
Unlike the expert affidavit in Basis PAC-Rim Opportunity Fund [Master] v TCW Asset Mgt. Co. (149 AD3d 146, 150-151 [1st Dept 2017], lv denied 30 NY3d 903 [2017]), which offered only a conclusory analysis of the quality or performance of the RMBS CDO's assets, here plaintiff's expert [*2]analyzed how defendants' conduct exposed plaintiff to undisclosed investment risks. In a dialogic exchange of several reports with defendants' experts, he examined the component assets in the Auriga securities to explain how defendants' conduct exposed plaintiff to undisclosed investment risk. Plaintiff's expert conducted regression analyses to determine the degree to which the alleged fraud by defendants, as opposed to the market crash, caused some of plaintiff's losses. "The empirical evidence shows that Magnetar deals in general, and Auriga in particular, performed worse than other mezzanine CDOs issued during the same period." For example, the expert noted, "Magnetar deals experienced events of default ['EODs'] on average approximately four months faster than other mezzanine CDO bonds issued in 2006 and 2007" and Auriga "failed 175 days earlier than the average mezzanine non-Magnetar deal." The expert further explained, "[a]ll 26 mezzanine Constellation deals experienced an [EOD.] This 100 percent EOD rate contrasts with an EOD rate of 82 percent . . . among non-Magnetar subprime CDOs issued in 2006 and 2007. The difference between these two EOD rates . . . is statistically significant."[FN1]
Plaintiff's expert also criticized the methodology of defendants' expert, who had opined that plaintiff's losses stemmed from market-wide events, not defendants' selection of collateral for Auriga. In particular, plaintiff's expert asserted that the regression analyses conducted by defendants' expert suffered from a number of flaws. He contended that these flaws undermined defendants' comparison of Auriga's RMBS assets with other benchmark RMBS assets, and that this in turn undermined defendants' conclusion that plaintiff's loss stemmed solely from macroeconomic events and not from the alleged fraud. In response, defendants' expert adjusted the variables in his regressions to demonstrate that plaintiff's criticisms are unfounded. On this record, where the parties' experts have engaged with each other's arguments this Court cannot decide on summary judgment which expert provides the correct analysis on the presence, or absence, of loss causation (see generally Beta Holdings, Inc. v Goldsmith, 129 AD3d 521, 522 [1st Dept 2015]).
With regard to lack of justifiable reliance on misrepresentations, the other ground on which the motion court granted summary judgment, plaintiff's fraud claim depends both on an affirmative representation (that Auriga's collateral manager would independently select the collateral) and an omission or concealment (that defendants structured Auriga to facilitate Magnetar's net-short strategy). The court was correct to the extent it held that plaintiff could not establish that it relied on an affirmative misrepresentation by defendants because it is undisputed that plaintiff never communicated directly with defendants about Auriga; rather, defendants communicated with plaintiff's investment advisor, nonparty IKB. Thus, to [*3]the extent plaintiff relies on an affirmative representation, its claim is barred by Securities Inv. Protection Corp. v BDO Seidman (95 NY2d 702, 710-711 [2001] [SIPC]), which held that no fraud action may be maintained against a defendant for misrepresentations made by a defendant to a third party where the third party did not communicate any negative information to the plaintiff. IKB clearly had discretion to filter and evaluate defendants' statements. It did not simply forward everything it received from defendants to plaintiff. Instead, it decided, in the first instance, whether to recommend an investment in Auriga. Once it made that decision, it used the materials it had received from defendants, as well as its own expertise, to create the investment proposal on which plaintiff relied.
However, to the extent plaintiff relies on an omission, its claim is not barred. Unlike the situation in SIPC, the omission in the instant action came from defendants, not the intermediary (the NASD in SIPC; IKB in the case at bar).
To try to salvage the part of its claim that relies on an affirmative representation, plaintiff contends that IKB was its agent, such that IKB's knowledge can be imputed to plaintiff. Under the circumstances of this case, plaintiff may make this argument on appeal (see e.g. Vanship Holdings Ltd. v Energy Infrastructure Acquisition Corp., 65 AD3d 405, 408-409 [1st Dept 2009]). However, it is unavailing. The Investment Advisory Agreement clearly states that IKB is an independent contractor, not plaintiff's agent (see Loreley Fin. [Jersey] No. 3 Ltd. v Wells Fargo Sec., LLC, 412 F Supp 3d 392, 411 [SD NY 2019]; see generally Quik Park W. 57 LLC v Bridgewater Operating Corp., 148 AD3d 444, 445 [1st Dept 2017]).
All concur except Gische J. who dissents in a memorandum as follows:




Gische, J. (dissenting)
 

I respectfully dissent because I disagree with the majority's conclusion that there are disputed issues of fact on the issue of loss causation, which would require a trial. I would vote to affirm the motion court's grant of summary judgment dismissing the complaint.
In December 2006, plaintiff invested $60,000,000 in Auriga, a synthetic collateralized debt obligation (CDO), where the collateral primarily consisted of subprime residential mortgage backed securities (RMBS) and credit default swap (CDS) positions that protected subprime RMBS against default (see e.g. HSH Nordbank AG v UBS AG, 95 AD3d 185, 190 [1st Dept 2012]).[FN2] The Merrill Lynch defendants created and managed the CDO. Defendant 250 Capital, a subsidiary of Merrill Lynch & Co., Inc., was the collateral manager, responsible for selecting all collateral held by Auriga. The CDO consisted of 11 tranches of notes and one tranche of preferred securities. Plaintiff purchased $20 million Class A2B notes and $40 million Class B notes. Plaintiff's investment strategy was to minimize risk by investing in senior tranches of the CDOs, which had the highest credit ratings[*4]. Cash generated by Auriga's assets was distributed to investors monthly, with the more senior and less risky tranches being paid first and the lowest and most risky tranches being paid last. Auriga was a "triggerless" CDO, meaning it lacked a mechanism (found in other CDOs) by which cash flows from riskier, lower tranches to less risky, more senior investments in the event of a default or downgrade.
In February 2008, Auriga experienced an event of default across all classes of notes. In October 2008, Auriga was liquidated and upon distribution of its final proceeds, plaintiff lost its entire investment.
Plaintiff seeks to recover its lost investment, based on a claim of common-law fraud. The gravamen of plaintiff's claim is that at the time it purchased Auriga's notes, defendants falsely represented that the investment vehicle was structured to benefit long investors, like plaintiff, who were interested in the steady cash flow it produced. Plaintiff claims that Auriga was actually a reverse-inquiry CDO, created for the benefit of nonparty Magnetar Capital LLC (Magnetar). Magnetar was a hedge fund that had an overall investment strategy to short the RMBS market. Plaintiff claims that defendants concealed the fact that Magnetar's undisclosed net-short equity investment in Auriga gave Magnetar an improper influence over the selection of Auriga's collateral. Magnetar's economic motives and strategy conflicted with plaintiff's strategy because Magnetar benefitted financially if Auriga failed. Magnetar sponsored Auriga by purchasing the deal's "equity" tranche, typically the junior long-position in a CDO and the hardest to sell because it is the riskiest. This, according to plaintiff, gave Magnetar an outsized influence over the collateral Auriga purchased. Plaintiff alleges that defendants intended from the outset to have Auriga fail and that had Magnetar's influence over and involvement in Auriga been disclosed, it would never have invested in Auriga because its predisposition to failure solely benefited Magnetar.
A claim for fraud requires proof by clear and convincing evidence of "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages" (Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 559 [2009]; Basis PAC-Rim Opportunity Fund [Master] v TCW Asset Mgt. Co., 149 AD3d 146, 149 [1st Dept 2017], lv denied 30 NY3d 903 [2017]). Furthermore, as to causation, plaintiff must prove two types of causation. The first is transaction causation, which is that "defendant's misrepresentation induced plaintiff to engage in the transaction in question," i.e., reliance (Laub v Faessel, 297 AD2d 28, 31 [1st Dept 2002]). Plaintiff must also be able to prove loss causation, which requires proof that the misrepresentations directly caused the losses about which it complains. Loss causation is the "causal link between the alleged misconduct and the economic harm ultimately [*5]suffered by the plaintiff" (Basis PAC-Rim., 149 AD3d at 149, citing Lentell v Merrill Lynch & Co., 396 F3d 172; Laub v Faessel at 31). Stated differently, loss causation requires that a plaintiff show that the "subject of the fraudulent statement or omission was the cause of the actual loss suffered" (Basis PAC-Rim at 149 [internal quotation marks and citation omitted]). When an investor suffers an investment loss due to a dramatic market wide phenomenon that causes comparable losses to other investors, loss causation is lacking because the losses would have occurred regardless of the fraud (id.).
I agree with the majority that loss causation analysis applies to a fraud claim concerning a CDO, such as Auriga. As the motion court correctly concluded, CDO notes are securities and the principle of loss causation applies to them (Dura Pharm., Inc. v Broudo, 544 US 336, 342 [2005]; Basis PAC-Rim, supra). I also agree with the majority that even if the price plaintiff originally paid for Auriga notes far exceeded their actual value at the time of purchase, overpayment does not support a cognizable theory of loss causation. Overpayment for an asset does not support a cause of action for securities fraud (Dura Pharm., Inc. v Broudo, 544 US 336, 342 [2005]; Basis PAC-Rim, supra). As stated by the United States Supreme Court, overpayment goes, instead, to the issue of damages (see e.g. Dura Pharm., Inc., 544 US at 338; see also Starr Found. v American Intl. Group, Inc., 76 AD3d 25, 29 [1st Dept 2010]["to determine damages, the factfinder need determine only the effect of an accurate disclosure on the price of the security at the particular time the transaction actually occurred"]). I also agree with the majority that, in any event, plaintiff is judicially estopped from claiming that it suffered a time of purchase loss in 2006 because plaintiff successfully defeated defendants' pre-answer motion for dismissal of the fraud claims as time-barred by arguing that it did not suffer a loss on its investment until 2008 at the earliest. (Loreley Fin. [Jersey] No. 28, Ltd. v Merrill Lynch, Pierce, Fenner & Smith Inc., 117 AD3d 463, 464 [1st Dept 2014]).
Where I depart from the majority is regarding its conclusion that here there is a disputed issue of fact on the issue of loss causation.
In support of their motion for summary judgment, defendants argued that plaintiff's losses were the result of the market-wide failures in the RMBS market in 2007 through 2009 and they presented evidence showing that market-wide economic factors resulted in pervasive defaults of other CDOs similar to Auriga. They contend that despite extensive discovery, plaintiff has not demonstrated a triable issue of fact regarding loss causation (Basis PAC-Rim, supra).
Dr. Hubbard, defendants' expert, performed a loss causation analysis that compared Auriga to comparable CDOs collateralized by subprime RMBS of the same rating. He determined that Auriga's RMBS and loan pools performed in line [*6]with comparable industry assets. He opined that the severe decline in housing prices and economic downturn increased defaults and delinquencies of subprime mortgages and that these defaults that resulted in market-wide catastrophic losses that did not spare CDOs, Auriga included. Dr. Hubbard concluded that Auriga would have failed, regardless of the collateral manager's selection process, and regardless of what collateral was chosen. This opinion was based upon his observation that Auriga's portfolio was predominantly composed of subprime RMBS and Auriga was a "triggerless" investment, a characteristic and risk disclosed in the offering material. Significantly, Dr. Hubbard applied principles of regression analysis to compare the performance of Auriga's pools to data about other benchmark loan pools and then evaluated the relationship between macroeconomic factors (the market), and the loan pools' performance. This same type of analysis was used by the defendants in Basis Pac-Rim[FN3] and accepted by this Court. It has also been used by the federal [FN4] courts in securities fraud cases. Applying this model, Dr. Hubbard observed that the performance of the loan pools supporting Auriga's core RMBS was adversely affected by market-wide events and that comparable loan pools were similarly affected. Based upon this analysis and observations, Dr. Hubbard concluded that "macroeconomic factors, specifically the unemployment rate and housing prices, had a statistically significant effect on the changes in the default and serious delinquency rates of Auriga's Core Loan Pools and the Benchmark Loan Pools during the periods studied."
In opposition to defendants' motion, plaintiff provided the report of its own expert, Dr. Neuberger. In his report, Dr. Neuberger opined that the prices plaintiff originally paid for Auriga greatly exceeded the value of the CDO because the collateral was overrated. He stated that had the ratings agencies been aware of the collateral selection process, the Auriga notes would have been rated significantly lower, or rendered unmarketable. Dr. Neuberger found that defendants' fraud contributed to and increased the likelihood and severity of plaintiff's post-purchase investment losses, leading him to approximate the true value of plaintiff's $60 million investment at $20 million.
Unlike Dr. Hubbard, Dr. Neuberger analyzed defendants' conduct in relation to the marketing and sale of Auriga's notes to plaintiff. He concluded that defendants' fraudulent conduct increased the likelihood that plaintiff would suffer economic loss because of the discrepancy between the collateral selection process, as presented to plaintiff, versus how the selection process was, fraudulently and covertly conducted. By examining the process by which collateral was selected for Auriga's notes, Dr. Neuberger concluded that defendants' fraudulent representations at the time of purchase preordained Auriga's failure because Magnetar would benefit if Auriga failed. Since [*7]Magnetar held the riskiest equity investment, Merrill went along with this strategy because of the obvious benefits of having Magnetar as an investor. Although Dr. Neuberger states that not every mortgage securitization that originated in 2006 and 2007 had weak cash flow or failed, he does not provide any examples or data supporting this conclusion (Basis PAC-Rim, 149 AD3d at 146). Nor does he provide any data to distinguish the level of Auriga's investment failure in 2008 from the catastrophic failures occurring in the marketplace at or about the same time.
I believe that defendants met their prima facie burden on summary judgment because they presented statistical data and evidence that plaintiff's loss was not due to any fraudulent statements or omissions by them, rather than the market-wide failure of RMBS and related financial vehicles (id.). Although Dr. Neuberger concluded that the Auriga notes were more likely to suffer events of default than other CDOs, the absence of any statistical data or information to support his conclusion fails to provide any evidence of loss causation. By failing to produce any evidence that it was defendants' misrepresentations, rather than market forces, that caused plaintiff's investment losses, there is no disputed issue of fact on loss causation. "[W]hen an investor suffers an investment loss due to a 'market crash . . . of such dramatic proportions that [the] losses would have occurred at the same time and to the same extent regardless of the alleged fraud,' loss causation is lacking" (Basis PAC-Rim, 149 AD3d at 149, quoting Loreley Fin. [Jersey] No. 3 Ltd. v Wells Fargo Sec., LLC, 797 F3d 160, 186-87 [2d Cir 2015]).
Although the majority finds that it cannot decide on summary judgment which expert is more credible, I disagree. When parties present conflicting expert testimony, it is usually for the jury to decide which expert's opinion is more credible (see e.g. Hernandez v 21 Realty Co., 113 AD3d 503 [1st Dept 2014]). Where, as here the expert's opinion is conclusory, it will not defeat summary judgment (Nguyen v Dorce, 125 AD3d 571, 572 [1st Dept 2015]). An expert opinion in opposition should not only address the movant's expert's assertions, it should also provide an explanation of the expert's reasoning (see Lowe v Japal, 170 AD3d 701, 702-703 [2d Dept 2019]). Dr. Neuberger's criticism of Dr. Hubbard's opinion only goes to the issue of what weight it should be accorded (see Madden v Dake, 30 AD3d 932, 937 [3d Dept 2006]). Such criticism does not satisfy plaintiff's own burden of raising a triable issue of fact as to whether its financial losses were due to defendants' statements and omissions (see Feng Xie v New York City Health & Hosps. Corp., 179 AD3d 895, 897 [2d Dept 2020]).
I, therefore, vote to affirm the motion court's decision dismissing the complaint. 
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: July 15, 2021



Footnotes

Footnote 1: Plaintiff's expert's report here is similar to the expert report on loss causation in China Dev. Indus. Bank v Morgan Stanley & Co. (183 AD3d 504 [1st Dept 2020]), another case involving CDOs, where we affirmed the denial of the defendants' summary judgment motion, saying, "issues of fact remain as to . . . whether defendants' alleged fraudulent conduct was the proximate cause of plaintiff's alleged losses" (183 AD3d at 506).

Footnote 2: In a credit default swap, the seller of credit risk, who also tends to own the underlying credit asset, pays a periodic fee to the risk buyer. In return, the risk buyer agrees to pay the seller a set amount if there is a default (HSH Nordbank AG v UBS AG, 95 AD3d at 189).

Footnote 3: Dr. Hubbard was also the defense expert in that case.

Footnote 4: Reed Const. Data Inc. v McGraw-Hill Cos., Inc. (49 F Supp 3d 385, 396 [SD NY 2014], affd 638 Fed Appx 43 [2d Cir 2016]) contains an exceptionally well-written and detailed explanation of regression analysis.