# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DENGRONG ZHOU, | ) | |
| | ) | |
| Plaintiff/Counterclaim | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0026-JRS |
| | ) | |
| LONG DENG and MARK FANG, | ) | |
| | ) | |
| Defendants/Counterclaim | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| iFRESH, INC., a Delaware corporation, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## ORDER DENYING DEFENDANTS/COUNTERCLAIM PLAINTIFFS' MOTION FOR A STAY PENDING APPEAL AND MOTION TO EXTEND STATUS QUO ORDER

**WHEREAS**, on January 12, 2021, Plaintiff, Dengrong Zhou, filed a complaint under 8 *Del. C.* § 225 ("Section 225"), seeking a declaration regarding the validity of a written consent signed by stockholders holding a majority of the shares of iFresh, Inc. ("iFresh" or the "Company") that purported to remove Defendants,

Long Deng and Mark Fang, from iFresh's board of directors (the "Board") and appoint Qiang Ou and Jiandong Xu in their stead (the "Consent");[1]

**WHEREAS**, on February 4, 2021, the Court entered a status quo order (the "Status Quo Order") that was to be effective during the pendency of the litigation;[2]

**WHEREAS**, on April 6, 2022, the Court issued a Post-Trial Memorandum Opinion (the "Opinion") entering judgment for Plaintiff;[3]

**WHEREAS**, on May 3, 2022, Defendants filed an amended notice of appeal from the Opinion with the Supreme Court of the State of Delaware;[4]

**WHEREAS**, on May 6, 2022, Defendants moved for a stay pending appeal and to extend the Status Quo Order until a decision on the motion to stay is entered (collectively, the "Motions");[5]

---

[1] Verified Compl. (D.I. 1).

[2] D.I. 25.

[3] *Zhou v. Deng*, 2022 WL 1024809 (Del. Ch. Apr. 6, 2022) ("Opinion"). The Opinion is filed as D.I. 210. Pinpoint citations to page numbers refer to the Westlaw version of the Opinion.

[4] D.I. 216.

[5] Defs./Countercl. and Third Party Claim Pls.' Mot. for Stay Pending Appeal ("Mot.") (D.I. 218).

**WHEREAS**, on May 12, 2022, Plaintiff filed his opposition to the Motions;[6] and

**WHEREAS**, on May 16, 2022, Defendants filed a reply in support of the Motions;[7]

**NOW THEREFORE, THE COURT FINDS AND ORDERS AS FOLLOWS**:

1.    The Motions are DENIED.

2.    Under Supreme Court Rule 32, this Court has discretion to grant a stay of its judgment pending appeal.[8]  In exercising that discretion, the Court is guided

---

[6] Pl. Dengrong Zhou's Opp'n to Defs.' Mot. for Stay Pending Appeal and for Extension of the Status Quo Order ("Pl.'s Opp'n") (D.I. 220).

[7] Defs./Countercl. Pls.' Reply in Supp. of Mot. for Stay Pending Appeal ("Defs.' Reply") (D.I. 223).  As Plaintiff correctly points out in his application to strike the Reply, the filing was unauthorized and unsolicited.  Letter to the Hon. Joseph R. Slights III, from Peter B. Ladig (D.I. 224) at 1.  This is consistent with a pattern Defendants have followed throughout this litigation.  *See* Opinion at *3 ("[A]fter full briefing on the motion [to dismiss third-party counterclaims], without leave of Court, Defendants (as Third-Party Plaintiffs) filed an Amended Third-Party Complaint just days before oral argument."); *id.* ("A few weeks before trial, Defendants sprang another new pleading . . . ."); *id.* at *6 ("Against better judgment, the Court has indulged Defendants' past attempts to inject untimely new claims into this case . . . .  Defendants' ever-changing claims and theories of liability conjure images of the arcade game 'whack-o-mole,' where every time Zhou bops an argument or theory advanced by Defendants on the head, Defendants suddenly appear somewhere else on the board with a new one.").  Ultimately, however, because the Reply does not affect the outcome, I will deny Plaintiffs' application to strike it.

[8] Supr. Ct. R. 32(a) ("A stay or an injunction pending appeal may be granted or denied in the discretion of the trial court, whose decision shall be reviewable by this Court.").

by the so-called *Kirpat* factors.[9]  Those factors direct the Court to: (i) make a preliminary assessment of the movant's likelihood of success on appeal; (ii) assess whether the movant will suffer irreparable harm if the stay is not granted; (iii) assess whether any other interested party will suffer substantial harm if the stay is granted; and (iv) consider whether the public interest will be served if the stay is granted.[10]

3.     The *Kirpat* factors "are not a checklist; they are balanced with 'all of the equities involved in the case together.'"[11]  "Such a balancing of equities is particularly complex when, as here, the interests at issue are not limited to an award of money."[12]

4.     Because *Kirpat* directs the trial court to assess the strength of its own reasoning and judgment, "the 'likelihood of success on appeal' prong cannot be interpreted literally or in a vacuum."[13]  Instead, "[i]f the other three factors strongly

---

[9] *Kirpat, Inc. v. Del. Alcoholic Beverage Control Comm'n*, 741 A.2d 356, 357 (Del. 1998); *see also Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *2 (Del. Ch. Nov. 7, 2013) ("In *Kirpat . . .* , the Supreme Court identified four factors to guide a trial court when exercising its discretion under Rule 32(a).").

[10] *Kirpat*, 741 A.3d at 357.

[11] *Klig v. Deloitte LLP*, 2010 WL 3489735, at *11 (Del. Ch. Sept. 7, 2010) (citing *Kirpat*, 741 A.3d at 358).

[12] *Paine Webber Ltd. P'ship Litig.*, 1997 WL 118401, at *1 (Del. Ch. Mar. 4, 1997).

[13] *Kirpat*, 741 A.3d at 358; *see also id.* ("Requiring a literal reading of the 'likelihood of success on appeal' standard 'would lead most probably to consistent denials of stay motions, despite the immediate threat of substantial irreparable injury to the movant'

4

favor interim relief, then a court may exercise its discretion to reach an equitable resolution by granting a stay if the petitioner has presented a serious legal question that raises a 'fair ground for litigation and thus more deliberative investigation.'"[14] "With this guidance in mind, the court often considers [factors (ii) through (iv)] before assessing whether the movant has presented a question that raises a fair ground for review by our Supreme Court."[15]

5.    Under *Kirpat* factor (ii), Defendants argue they will suffer irreparable harm if the stay is not granted because "the board composition remains disputed, creating the risk of unauthorized and irreversible board action."[16]  On one hand, in the context of motions to stay judgments where control of a Delaware business entity is at stake, this court has recognized that the "risk of unauthorized Board action . . . supports finding a threat of irreparable harm."[17]  On the other hand, loss of board

---

because the trial court would be required first to confess error in its ruling before it could issue a stay.") (quoting *Evans v. Buchanan*, 435 F. Supp. 832, 843 (D. Del. 1977)).

[14] *Id.* (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)).

[15] *Rosenbaum v. CytoDyn Inc.*, 2021 WL 4890876, at *1 (Del. Ch. Oct. 20, 2021); *see also Klaassen*, 2013 WL 5967028, at *2 ("Informed by *Kirpat*, this decision analyzes the second, third, and fourth factors, then returns to the first.").

[16] Mot. at 3.

[17] *Klaassen*, 2013 WL 5967028, at *3; *see id.* ("It is entirely possible that the Supreme Court could reverse the Opinion and vacate the Final Order. . . .  If [] unauthorized actions could not be unwound or remedied, then irreparable injury would result.").

control alone cannot constitute irreparable harm for purposes of *Kirpat*, as the party seeking a stay "must point to some injury other than compliance with [the] Court's Order" to carry its burden under *Kirpat*.[18]  According to Defendants, irreparable harm can be found in the fact that Plaintiff "intends to revamp company management wholesale and has already appointed his own daughter as [] CEO."[19]  Beyond this conclusory contention, however, Defendants identify no other direct harm to themselves or potential for destructive changes within iFresh that will indirectly cause them harm.  The fact that a party will replace management after prevailing on a Section 225 claim does not, alone, threaten the replaced directors with irreparable harm such that a stay is warranted.[20]  I am satisfied this factor weighs against a stay.

6.      Under factor (iii) of *Kirpat*, Defendants argue that a stay will not cause substantial harm to others because the stay will be brief given that "the appeal is scheduled to be fully briefed by August[] 2022."[21]  They also argue that the absence of a stay will cause iFresh and its lender, KeyBank, harm because Defendant Deng

---

[18] *Lynch v. Gonzalez*, 2020 WL 5648567, at *4 (Del. Ch. Sept. 22, 2020) (quoting *Jagodzinski v. Silicon Valley Innovation Co., LLC*, 2011 WL 4823569, at *3 (Del. Ch. Aug. 16, 2011)).

[19] Mot. at 3–4; *see* Mot. Ex. B.

[20] *See Frankino v. Gleason*, 1999 WL 1063071, at *1 (Del. Ch. Nov. 12, 1999) ("[D]efendants claim that they will suffer irreparable harm if a stay is not granted because [plaintiff] will alter the business plan they were implementing.  This argument, obviously, cuts both ways, as [plaintiff] would surely make the same claim if I grant the stay.").

[21] Mot. at 4; *see* Mot. Ex. C.

is no longer a director of iFresh or its CEO, and KeyBank "views Long Deng's involvement as critical to ensuring continuity and a smooth transition."[22] I am not persuaded by either argument for several reasons. First, although the stay pending appeal might be relatively brief, Defendants have already spent more than a year at iFresh's helm under the Status Quo Order, even though "there has never been a dispute as to the facial validity of the [w]ritten [c]onsent" removing them.[23] Any further delay is unnecessary and deprives Plaintiff of the legal effect of the Consent that the Court has now adjudicated to have been valid from the time of its delivery to the Company. Second, while I acknowledge that KeyBank's forbearance is critical to iFresh's continued operations,[24] the status quo at iFresh is that a majority of its stockholders have exercised their right to remove and replace members of the Board (through a consent that indisputably is valid as a matter of form and as a matter of law), and the Board has exercised its right to make changes in management.

---

[22] Mot. Ex. H at 1; *see generally id.* (email from KeyBank's counsel setting forth a term sheet for forbearance, including that Deng is "reinstated as President of NYM and its subsidiaries"). Defendants point to several other facts to illustrate Deng's importance to iFresh. First, iFresh's SEC filings disclose that "iFresh's success is substantially dependent on the continued service of its senior management . . . and in particular Long Deng." Mot. Ex. D at 12. Second, "iFresh leases its primary wholesale and distribution facility from 'Dragon Development LLC,' a company 50% controlled by Deng." *Id.* Finally, KeyBank has expressly stated that it is concerned about "who is now managing the day-to-day operations." Mot. Ex. H at 1.

[23] Pl.'s Opp'n at 2.

[24] *See* Mot. at 6; *see also* Mot. Exs. E–F.

Denial of the stay reinforces those rights and provides critical clarity to KeyBank and all others who deal with iFresh at arms-length regarding "the current directors and officers"[25] of the Company and "who is now managing [its] day-to-day operations."[26] Moreover, Defendants' assertion of harm to KeyBank is overblown. KeyBank is capable of negotiating forbearance terms to protect its interest and neutralize any supposed harm resulting from Defendant Deng's removal, as illustrated by Defendants' own exhibits.[27]

7. Factor (iv) of *Kirpat* asks the Court to determine whether the public interest will be served if the Motions are granted. "Who controls the board of directors, although 'critically important to the litigants' and other stakeholders, implicates the 'private interests of particular corporate constituencies,' not the public interest."[28] Even if some public interest is implicated here because of iFresh's status

---

[25] Mot. Ex. F.

[26] Mot. Ex. H at 1.

[27] *See* Mot. Ex. F (letter from KeyBank's counsel requesting a meeting with new iFresh leadership to "understand the general intentions of the current directors and officers" and "to understand the . . . plans for repaying the obligations owed to KeyBank"); Mot. Ex. H (email from KeyBank's counsel discussing a term sheet "summarizing the terms and conditions on which the bank would enter into a forbearance agreement with iFresh and its subsidiaries," including involvement from Defendant Deng (not as CEO or director) "to ensur[e] continuity and a smooth transition").

[28] *Rosenbaum*, 2021 WL 4890876, at *3 (citing *Klaassen*, 2013 WL 5967028, at *3).

as a public company,[29] it is counterbalanced by Delaware's interest in "expeditiously complet[ing] and effectuat[ing] § 225 actions."[30] This is particularly so here given that Plaintiff has made at least a credible case that allowing Defendants to continue leading iFresh is not in the best interests of its stakeholders.[31] In all, this factor is, at best, neutral for Defendants.

8. Based on the foregoing, I am satisfied that *Kirpat* factors (ii)–(iv) and the balance of equities weigh in favor of denying the Motions. Our Supreme Court has counseled that "[i]f [*Kirpat* factors (ii)–(iv)] *strongly favor* interim relief, then a court may exercise its discretion to reach an equitable resolution by granting a stay *if* the petitioner has presented a serious legal question that raises 'fair ground for litigation and thus for more deliberative investigation'"[32] For the reasons just

---

[29] *See* Mot. at 7 (arguing that stakeholder concerns "are even more acute . . . given that iFresh is a public company").

[30] *Frankino*, 1999 WL 1063071, at *2.

[31] *See, e.g.*, Pl.'s Opp'n at 3 ("iFresh suffered under [Defendant Deng's] stewardship, defaulting multiple times on its main credit facility and ultimately losing its listing on the NASDAQ main board. All the while Deng enriched himself and his wife by drawing combined salaries of nearly $1M a year and engaging in a series of related party transactions."); *id.* ("The [NASDAQ] Panel cannot help but conclude that [iFresh's weakness in financial reporting] is a symptom of a larger problem within the Company, namely that it has not taken its role as public company seriously . . . . Unfortunately, there are multiple instances during the Company's four-year listing that the Panel can point to in support of this conclusion."); *id.* ("Deng's actions led to an SEC investigation."); *id.* at 11 ("[W]hile iFresh has been spiraling, Deng kept taking excess compensation.").

[32] *Kirpat*, 741 A.2d at 358 (emphasis added) (citing *Washington Metro*, 559 F.2d at 844); *see also Rosenbaum*, 2021 WL 4890876, at *4 ("Factor (i) cannot save Plaintiffs' Motion

explained, the last three *Kirpat* factors do not favor granting the Motions.  Nor am I persuaded Defendants have raised legal questions worthy of serious appellate review.

9. The Opinion did not break new legal ground or extend settled law.[33] Nevertheless, Defendants argue they have identified two "serious legal question[s] that raise[] a fair ground for appeal."[34]  First, they argue the Court erred in not applying New York's "peculiar knowledge" exception to justifiable reliance in a fraud claim.[35]  Second, they argue the Court erred when it found that Defendants waived the argument that the Consent was invalid because Plaintiff aided and abetted in Amy Xue's (iFresh's CFO) breach of her fiduciary duties in order to secure at least some of the shares voted in the Consent.[36]  I address each in turn.

---

because 'the other three factors' do not 'strongly favor interim relief,' and granting the Motion would not otherwise be an 'equitable resolution.'") (quoting *Kirpat*).

[33] *See, e.g.*, *Zohar CDO 2003-1, LLC v. Patriarch P'rs, LLC*, 2016 WL 6661932, at *1 (Del. Ch. Nov. 10, 2016) (ORDER) (denying motion to stay pending appeal in a contract dispute because movant did not "present issues of first impression or pressing issues of Delaware law for resolution" and the court's judgment involved only "straightforward issues of contract interpretation").

[34] *Klaassen*, 2013 WL 5967028, at *3.

[35] Mot. at 8–11.  "The 'peculiar knowledge' exception applies when a party takes reasonable steps to verify its counterparty's statements but is unable to do so because the underlying information is impractically expensive to obtain or solely within the control of the counterparty."  *O.F.I Imports Inc. v. Gen. Elec. Cap. Corp.*, 2016 WL 5376208, at *6 (S.D.N.Y. Sept. 26, 2016).

[36] Mot. at 11–13.

10.     After reviewing the parties' submissions and the relevant case law, I remain satisfied that the Court correctly interpreted New York's "peculiar knowledge" exception. In the Opinion, the Court held that the exception "is inapplicable here," that "Defendants and iFresh are sophisticated parties who were represented by counsel," and that "[t]he peculiar-knowledge exception has been rejected by courts when sophisticated parties could have negotiated contractual protections for themselves."[37] Those holdings reflect a proper understanding and application of the peculiar knowledge exception,[38] especially in light of the Court's factual findings that the purported misrepresentations were rebutted by information in public records readily accessible to Defendants and iFresh had they bothered to

---

[37] Opinion at *13 n.122.

[38] *See, e.g.*, *O.F.I. Imports*, 2016 WL 5376208, at *6 ("[The peculiar knowledge] exception is stringently applied when the contracting parties are sophisticated entities and does not apply where the plaintiff had a low[-]cost alternative such as insisting that the written contract terms reflect any oral undertaking on a deal-breaking issue.") (collecting cases) (internal quotation marks omitted); *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 115 (Del. 2012) ("[T]he peculiar-knowledge exception has been rejected by [New York] courts in circumstances where sophisticated parties could have easily insisted on contractual protections for themselves."); *Silver Point Cap. Fund, L.P. v. Riviera Res., Inc.*, 155 N.Y.S.3d 155, 156 (N.Y. App. Div. 2021) ("The 'peculiar knowledge' doctrine does not apply; plaintiffs are sophisticated parties that were aware that they were not provided with full information but nonetheless agreed to go forward with a transaction without either demanding access to the omitted information or assurances in the form of representations and warranties."); *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 188–89, 195 (N.Y. App. Div. 2012) ("HSH could have uncovered any misrepresentation . . . through the exercise of reasonable due diligence within the means of a financial institution of its size and sophistication. . . . The principle that sophisticated parties have a duty to exercise ordinary diligence . . . has particular application where, as here, the true nature of the risk being assumed could have been ascertained from . . . publicly available information.").

conduct even basic due diligence.[39]  Nevertheless, Defendants submit that the Court

erred because the peculiar knowledge exception "applies regardless of the level of

sophistication of the parties,"[40] and, therefore, the Court's holding to the contrary

---

[39] Indeed, these factual findings undercut the initial premise that Plaintiff's conviction and participation in a pyramid scheme—at the heart of the alleged fraudulent misrepresentation—was in the "peculiar knowledge" of Plaintiff in the first place. *See, e.g.*, *HSH Nordbank*, 95 A.D.3d at 196 (holding that data "derived from publicly available market information" was "not peculiarly within UBS's knowledge"); *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 278–79 (N.Y. 2011) ("If the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.") (cleaned up) (quoting *DDJ Mgmt., LLC v. Rhone Gp. L.L.C.*, 931 N.E.2d 87, 91 (N.Y. 2010)); *see also* Opinion at \*12–13 ("Defendants could not have reasonably relied on Zhou's messages to Deng because Zhou's conviction was a matter of public record. . . .  The same is true for the other supposed misrepresentations identified by Defendants.  As representatives of a publicly traded company, Defendants could have readily determined whether Ou and Zhou met the requirements of Section 3(c) by exercising reasonable due diligence.  Again, iFresh performed no due diligence . . . .").

[40] *TIAA Global Invs., LLC v. One Astoria Square LLC*, 127 A.D.3d 75, 87 (N.Y. App. Div. 2015); *see also* Mot. at 9; *Dandong v. Pinnacle Performance Ltd.*, 2011 WL 5170293, at \*14 (S.D.N.Y. 2011) ("[E]ven a sophisticated investor armed with a bevy of accountants, financial advisors, and lawyers could not have known that [the plaintiff] would select inherently risky underlying assets and short them."), *aff'd in part and remanded in part by Lam Yeen Leng v. Pinnacle Performance Ltd.*, 474 F. App'x 810 (2d Cir. 2012); *LBBW Luxenburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 517–18 (S.D.N.Y. 2014) ("Internal proceedings and matters of intent can qualify as peculiar knowledge even when they relate to matters of public record. . . .  Where facts were peculiarly within the knowledge of the defendants . . . the failure of the plaintiffs to ascertain their truth by inspecting the public records is not fatal to their action. . . .  Here, the Defendants . . . had greater access to relevant facts . . . .  [T]he peculiar knowledge exception applies here because the defendant had access to nonpublic information regarding the deteriorating credit quality of subprime mortgages.").  I note that each of these cases involve a pleading-stage adjudication of a motion to dismiss, not a fact intensive post-trial decision.

presents a "serious legal question on appeal."[41] But the Court's determination that the peculiar knowledge exception was inapplicable stemmed not only from the (correct) legal observation that "[t]he peculiar-knowledge exception has been rejected by courts when sophisticated parties could have negotiated contractual protections for themselves,"[42] but also from the Court's factual findings regarding the accessibility of information, lack of any meaningful diligence and the parties' sophistication, among others.

11. In any event, even if the peculiar knowledge exception applied here, it would not save Defendants' case because "Defendants' attempt to prove that the shares voted in the Consent were obtained by . . . fraud or other wrongdoing failed for want of adequate proof" on *several* levels.[43] For instance, Defendants failed to prove, by clear and convincing evidence, a material misstatement in the purchase agreement whereby Plaintiff obtained his shares.[44] And, regarding Plaintiff's extra-contractual statements, the Court noted that "it is difficult to see how Zhou's omissions or misleading statements . . . factually could support a fraud claim where the contract contains a rather broad integration clause and Defendants made no

---

[41] Defs.' Reply at 2.

[42] Opinion at *13 n.122.

[43] *Id.* at *18.

[44] *Id.* at *9–11.

13

attempt to prove why they would have agreed to that clause" if the parties had reached understandings outside the purchase agreement.[45] Finally, the Court observed that "Zhou's supposed extra-contractual denial of his association with the pyramid scheme" did not "cause[] the transaction by which Zhou acquired his shares . . . to be tainted by fraud to a degree that it is reasonable to conclude the transaction would not have been consummated had the fraud been detected pre-closing," such that the Court could "justify a declaration that his attempt to vote his iFresh shares was void."[46] Even if applicable, the peculiar knowledge exception does not remedy these deeper flaws.[47]

12.    Defendants also argue the Court erred in finding they waived any argument that the Consent was somehow invalid as the product of a breach of fiduciary duty by not timely raising the argument. They submit this case is analogous to *Bäcker v. Palisades Growth Capital II, L.P.*, where the Court held there was no waiver of an argument raised post-trial that certain specific acts were deceptive because the opposing party "had the opportunity to explore [such]

---

[45] *Id.* at *12.

[46] *Id.* (noting that the evidence supported a finding that iFresh was desperate to close the challenged transactions).

[47] There is more. The Court observed "a fundamental flaw in the assumption underlying each of Defendants' fraud theories—that a party seeking to buy a company's stock has a common law duty . . . to disclose when doing so that he ultimately intends to take control of a company." *Id.* at *9.

deception," as it "was the subject of discovery requests and deposition testimony" and discussed in a pretrial brief.[48]   But in *Bäcker*, the plaintiff had "*consistently argued* that the Bäckers deceived their fellow directors by representing support for the board's original agenda while concealing a secret counter-agenda to seize control of the company" and thus gave the opposing party "ample notice" of the theory.[49] With that said, *Bäcker* explicitly recognized that this court "has rejected arguments that a party failed to raise before trial on the basis that the opposing party may have tried the case differently given notice of the new argument."[50]   For all the reasons

*Remainder of Page Intentionally Left Blank*

---

[48] *Bäcker v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 104 (Del. 2021); *see also* Mot. at 12 ("Here, similarly, the parties undertook extensive discovery into how Zhou directed Xue's actions as iFresh's CFO. . . .  Furthermore, the same facts were briefed pretrial and tried . . . .").

[49] *Bäcker*, 246 A.3d at 103–04 (emphasis added).

[50] *Id.* at 103.

stated in the Opinion, Defendants gave Plaintiff no such notice.[51] As Plaintiff bluntly observes, "[w]aiver is not a close call here."[52]

13. As for the Status Quo Order, "extending" it at this point would be problematic both practically and jurisdictionally. "[A status quo order] is a practical instrument intended to operate in a practical manner"[53] by "maintain[ing] stability" in Section 225 disputes.[54] Defendants' delay in filing the Motions makes granting them impractical. The Court issued the Opinion on April 6, 2022, and entered a final order awarding costs on April 22, 2022.[55] Yet Defendants offered no hint they would

---

[51] Opinion at *7 ("The breach of fiduciary duty and aiding and abetting arguments were not introduced as grounds to invalidate the Consent until after trial in Defendants' post-trial brief. That is too late to argue a new claim. Defendants' pretrial brief mentions Amy Xue's involvement in this case in its recitation of the background facts. But neither the Amended Counterclaim, the pretrial order not the pretrial briefing provided Zhou with *any* indication that a breach of fiduciary duty or aiding and abetting claim was on the table for trial. Indeed, the phrases 'aiding and abetting' and 'fiduciary duty' do not appear a *single time* in the Amended Counterclaim, the pretrial order or the pretrial briefs.") (emphasis in original) (footnote and internal quotation marks omitted). As Plaintiff observed in a post-trial brief, this theory may have sprouted from Defendant Deng's testimony, offered for the first time at trial, that Amy Xue was "engaging in criminal act of violating her fiduciary duty." Trial Tr. 309:7–9 (Deng); *see* Pl.'s Reply to Defs.' Post-Trial Br. (D.I. 203) at 15.

[52] Pl.'s Opp'n at 10.

[53] *Frankino v. Nat'l Auto Credit, Inc.*, 1999 WL 959188, at *1 (Del. Ch. Sept. 29, 1999).

[54] *Cap. Link Fund I, LLC v. Cap. Point Mgmt., L.P.*, 2015 WL 7731766, at *3 (Del. Ch. Nov. 25, 2015).

[55] D.I. 210, 215.

16

seek to extend the Status Quo Order or stay the judgment until weeks later. In the meantime, on April 27, 2022, the new iFresh Board met and, among other things, removed Deng as CEO.[56] Given the current makeup of Company leadership following that meeting, what Defendants actually seek is *reinstatement* of the *pre-judgment* status quo, not an extension of the *current* status quo.[57] Granting the Motions, at this stage, would "sow confusion" into iFresh's ongoing negotiations with KeyBank and its interactions with other arms-length parties.[58] Indeed, Defendants would have me declare that Deng was in, then out, and now back in. That is unnecessary and, as stated, confusing.

14. Moreover, there is a serious question whether entering a new status quo order when one currently is not in place would be appropriate given this Court's limited jurisdiction following the appeal of the action.[59] In other words, given

---

[56] *See* Mot. Exs. G–H.

[57] Pl.'s Opp'n at 2, 4.

[58] *Id.* at 5; *see also* Mot. Exs. F–H.

[59] Whether I have jurisdiction to reinstate a now-ineffective pre-judgment status quo order, with modifications no less, is unclear. Supreme Court Rule 32(a) gives this court limited jurisdiction to address a motion to stay following the filing of an appeal and allows the court to "impose such terms and conditions . . . as may appear appropriate in the circumstances." Supr. Ct. R. 32(a); *see also In re UnitedHealth Gp. Inc. Section 220 Litig.*, 2018 WL 2110958, at *1–3 (Del. Ch. Apr. 27, 2018) (ORDER) (granting conditional stay to preserve status quo to enable the appellant to seek a longer stay from the Supreme Court); *B.F. Rich Co., Inc. v. Gray*, 2006 WL 3872830, at *2 (Del. Ch. Dec. 15, 2006) (continuing a protective order in response to a party's motion to stay pending appeal). To be sure, Court of Chancery Rule 62(c) allows this court, "in its discretion," to "suspend, modify, restore, or grant an injunction during the pendency of the appeal." Ct. Ch. R. 62(c).

Defendants' delay, I am particularly reluctant to grant the Motions, which would involve entering new orders in a manner that potentially stretches the Court's limited post-appeal jurisdiction beyond its tolerance. And, for the reasons already explained, Defendants have provided no persuasive reason to test that tolerance.

15. For all the foregoing reasons, the Motions must be DENIED.

DATED: May 23, 2022

*/s/ Joseph R. Slights III*
Vice Chancellor

---

But there is no injunction currently in place, as the temporary restraining (status quo) order terminated with Opinion, and the status quo preserved by that Order no longer exists. *See* Status Quo Order (D.I. 25) (setting forth the iFresh board of directors "[d]uring the pendency of this litigation" and prohibiting certain actions "[p]ending the further decision by the Court"); *see also Lynch*, 2020 WL 5648567, at *1 ("Paragraph 1 of the SQO permits Lynch 'and the current management under Lynch' to serve as Belleville's manager and legal representative 'during the pendency of the Litigation, or until otherwise directed by the Court.' When this Court enters its final judgment, this term will expire. . . . By its terms, the entire SQO was to remain in full force and effect until this Court specifically orders otherwise, such that it would terminate upon entry of a final judgment."); *Eagle Force Hldgs., LLC v. Campbell*, 235 A.3d 727, 744 (Del. 2020) (holding that a status quo order did not remain in effect after the trial court's post-trial final judgment when, by its terms, it remained "in effect pending the conclusion of this action or further order of this Court").